NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
JAMES A. SANTIAGO (Cal. Bar No. 300459)
Assistant United States Attorney
General Crimes Section
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-2229
     Facsimile:  (213) 894-0141
     E-mail:     james.santiago@usdoj.gov

Attorneys for Applicant
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: CELLULAR TELEPHONES | No. **2:20-MJ-06179**<br><br>GOVERNMENT'S *EX PARTE* APPLICATION FOR A WARRANT AUTHORIZING THE DISCLOSURE OF HISTORICAL CELL-SITE INFORMATION, AND PROSPECTIVE CELL SITE AND GPS INFORMATION, AND REQUEST TO SEAL; AFFIDAVIT OF ALFREDO ROSSI<br><br>**(UNDER SEAL)** |

The United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby applies for a warrant requiring cellular telephone service provider(s) to furnish Homeland Security Investigations (the "Investigating Agency") with information relating to the following cellular telephones:

a.    626-404-5413, a cellular telephone issued by T-Mobile ("Carrier")[1] and believed to be used by Hue Kim Lam, also known as "Jennifer Lam" ("**Subject Telephone 1**"); and

b.    626-423-8232, a cellular telephone also issued by T-Mobile, subscribed to D.H., and believed to be used by Hue Kim Lam ("**Subject Telephone 2**"; and, together with **Subject Telephone 1**, collectively referred to as the "**Subject Telephones**").

Specifically, authorization is sought to obtain historical cell-site information, that is, information reflecting the location of cellular towers (cell-site and sector/face) related to the use of the **Subject Telephones** ("cell-site information"), to include call detail, text, and data information, for the **Subject Telephones** that was gathered by the Carrier from October 13, 2020 through December 11, 2020, along with any other associated data that was collected by the Carrier, but not including the contents of any communication.

Additionally, authorization is sought to obtain prospective cell-site information, as well as the physical location of the **Subject Telephones**, to include E-911 Phase II data and latitude and longitude data gathered for the **Subject Telephones**, including Global Positioning Satellite and/or network timing information, including Sprint's Per Call Measurement Data, Verizon's Real Time Tool, AT&T's Network Event Location System, and T-Mobile's True Call data, and including information from such programs as Nextel Mobile Locator,

---

[1] The Investigating Agency obtained information related to the **Subject Telephones** from a bail agent.  Due to the immediate need to locate the fugitive target before she stops using the **Subject Telephones**, there is insufficient time to obtain subscriber records from the telephone company, which could take up to several weeks, without jeopardizing the fugitive investigation.

Boost Mobile Loopt, Sprint/Nextel Findum Wireless, which will establish the approximate location of the **Subject Telephones**, and which information is acquired in the first instance by the Carrier ("GPS information"), at such intervals and times as the government may request, and the furnishing of all information, facilities, and technical assistance necessary to accomplish said disclosure unobtrusively, for a period of 45 days.

The application is made in connection with an attempt to locate Hue Kim Lam, also known as Jennifer Lam ("LAM" or the "Target Subject"), a fugitive from a federal arrest warrant, and is based upon the attached agent affidavit.  The arrest warrant commands that LAM be brought to answer for an Indictment charging her with violations of 18 U.S.C. § 1029(a)(2): Using an unauthorized access device and obtaining things of value aggregating at least $1,000 during a one-year period; 18 U.S.C. § 1028A(a)(1): Using a means of identification belonging to another person; 18 U.S.C. § 1029(a)(3): Possessing at least fifteen unauthorized access devices; and 18 U.S.C. § 1029(a)(4): Possessing device-making equipment (the "Target Offenses").  There is probable cause to believe that the information likely to be received concerning the approximate location of the **Subject Telephones**, currently within, or being monitored or investigated within, the Central District of California, and the requested historical cell-site information will constitute or yield evidence of the Target Subject's current location.

Search warrants may issue to aid in locating the subject of an arrest warrant, just as they may be used to locate contraband or other evidence.  "Because the apprehension of fugitives is an important societal objective, the law authorizes the issuance of

search warrants [involving] significant invasions of privacy . . . to locate a defendant sought pursuant to an arrest warrant." In re Smartphone Geolocation Data Application, 977 F. Supp. 2d 129, 136 (E.D.N.Y. 2013).  Even a third party's home, in which privacy interests are paramount, may be searched pursuant to a search warrant "based on an independent determination by a magistrate . . . that [a] person named in the arrest warrant is probably in the home."  United States v. Underwood, 717 F.2d 482, 485 (9th Cir. 1983); see also United States v. Donaldson, 793 F.2d 498, 502 (2d Cir. 1986) (explaining that the Supreme Court's search warrant analysis "places fugitives on the same constitutional footing as contraband such as drugs").  Indeed, the Supreme Court has long recognized that a search warrant may be based on "probable cause to believe that 'the evidence sought will aid in a particular apprehension'" of a suspect, not just probable cause to believe that the evidence sought will support the suspect's conviction.  Dalia v. United States, 441 U.S. 238, 255 (1979) (quoting Warden v. Hayden, 387 U.S. 294, 307 (1967) (authorizing the use of warrants to get evidence to locate a wanted person) (emphasis added).

Rule 41 also allows for the issuance of search warrants solely for the purpose of locating "a person to be arrested."  Fed. R. Crim. P. 41(c)(4).  As explained by its drafters, Rule 41 was intended "to make it possible for a search warrant to issue to search for a person . . . when there is probable cause to arrest that person[.]"  Adv. Comm. Notes to 1979 Amendments to Fed. R. Crim. P. 41 (emphasis in original); see also id. (explaining that the Rule "authorizes issuance of a search warrant to search for a person to be arrested").

Courts thus regularly issue search warrants aimed at obtaining information – including electronic data – that may reveal the location of an individual subject to arrest.  In United States v. Patrick, 842 F.3d 540 (7th Cir. 2016), for example, the court upheld a search warrant that authorized law enforcement "to locate [the defendant] using cell-phone data" based on the fact that the defendant was subject to an arrest warrant.  Id. at 542 ("Police were entitled to use a warrant to obtain data that would help them track down Patrick's location.").  Similarly, in In re Smartphone, the court held that "where, as here, the Government demonstrates probable cause to believe that prospective geolocation data will aid in the apprehension of a defendant, a court may issue a search warrant to authorize access to such data."  977 F. Supp. 2d at 137.

The information sought by this application first includes information about the location (physical address) of the "cell-sites" concerning the cell-sites/sectors that received or transmitted signals to and from a **Subject Telephones** during the requested period and also for prospective data linked to the **Subject Telephones** at call origination (for outbound calling), call termination (for incoming calls), and, if reasonably available, during the progress of a call.  This information, which is acquired in the first instance by the Carrier, includes any information, apart from the content of any communication, that is reasonably available to the Carrier and that is requested by the Investigating Agency, concerning the cell-sites/sectors receiving and transmitting signals to and from the **Subject Telephones** whether or not a call is in progress.  This information is sought based first on 18 U.S.C.

§ 2701 <u>et seq.</u> (the "Stored Communications Act").  The Stored

Communications Act provides:

> A governmental entity may require a provider of electronic communication service . . . to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only[2] when the governmental entity --
>
> (A)  obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction[.][3]

18 U.S.C. § 2703(c)(1); <u>see also</u> <u>Carpenter v. United States</u>, 138

S.Ct. 2206 (2018) (holding that a warrant is required to obtain

seven or more days' worth of historical cell-site information).[4]

---

[2] This section also provides other methods to compel disclosure, including via subpoena or court order.  However, the government in this case is proceeding under the highest threshold, that is, obtaining a warrant as described in § 2703(c)(1)(A).

[3] This Court is a "court of competent jurisdiction" because it is a "district court of the United States (including a magistrate judge of such a court) . . . that . . . has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  This is true even if the subject of the investigation, and/or his or her phone, is in another district.  <u>See</u>, <u>e.g.</u>, <u>United States v. Ackies</u>, 918 F.3d 190, 201-02 (1st Cir. 2019) (finding in the context of a warrant issued in one district for location information regarding phones physically located in another district that § 2703's plain text and structure, supported further by legislative history and Congressional intent, make clear that § 2703 permits searches not governed by Rule 41's geographic limitations).

[4] The definition of terms in the Stored Communications Act makes clear that the "record or other information" that a court may order a provider to disclose to the government under Section 2703(c)(1)(A) includes both cell site and other location information.  First, the Stored Communications Act expressly adopts the definition of statutory terms set forth in 18 U.S.C. § 2510.  <u>See</u> 18 U.S.C. § 2711 ("As used in this chapter. . . (1) the terms defined in section 2510 of this title have, respectively, the definitions given such terms in that section").  Thus, the term "provider of electronic communication service" used in Section 2703(c) covers cellular telephone service providers, because 18 U.S.C. § 2510(15) defines "electronic communications service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications."  18 U.S.C. § 2510(15).  Further, cell site and other location information is "a record or other information pertaining to a subscriber to or customer of" an electronic

6

Prospective cell-site information is also sought based on the authority of 18 U.S.C. § 3121 et seq. (the "Pen Register Statute").[5] The government therefore also complies with the provisions of that statute, including by providing the required certification by the attorney for the government at the end of this application. Pursuant to the Pen Register Statute, upon an application made under 18 U.S.C. § 3122(a)(1) a court "shall enter an ex parte order authorizing the installation and use of a pen register or trap and trace device anywhere within the United States, if the court finds that the attorney for the Government has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation."  18 U.S.C. § 3123(a)(1).[6]

Cellular telephone companies routinely create and maintain, in the regular course of their business, records of information concerning their customers' usage.  These records typically include

communications service – another term used in Section 2703(c) – because cellular telephone service providers receive and store the information, if sometimes only momentarily, before forwarding it to law enforcement officials.  See In Re: Application of the United States for an Order for Prospective Cell Site Location Information on a Certain Cellular Telephone, 460 F. Supp. 2d 448, 457-60 (S.D.N.Y. 2006).

[5] 18 U.S.C. § 3127(3) defines "pen register" as "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, provided, however, that such information shall not include the contents of any communication."  A "trap and trace" device is similarly defined for any device or process which captures incoming data.  See 18 U.S.C. § 3127(4).

[6] While 47 U.S.C. § 1002, which is part of the Communications Assistance for Law Enforcement Act of 1994 ("CALEA"), would preclude seeking physical location information based on the Pen Register Statute alone, the Stored Communications Act provides the requisite additional authority for this Court to authorize the production by the Carrier of cell-site information to the government.

for each communication a customer makes or receives (1) the date and
time of the communication; (2) the telephone numbers involved;
(3) the cell tower to which the customer connected at the beginning
of the communication; (4) the cell tower to which the customer was
connected at the end of the communication; and (5) the duration of
the communication.  The records may also, but do not always, specify
a particular sector of a cell tower used to transmit a
communication.  Cell-site information is useful to law enforcement
because of the limited information it provides about the general
location of a cell phone when a communication is made.

This application also seeks GPS information for the **Subject
Telephones**, which is sought based on 18 U.S.C. § 2703(c)(1)(A) and
Federal Rule of Criminal Procedure 41.  As discussed above, data
that provides information about the location of a customer's phone
falls within 18 U.S.C. § 2703(c)'s definition of "a record or other
information pertaining to a subscriber to or customer of [an
electronic communication service]."  Thus, the United States may
obtain a warrant requiring a cell phone company to disclose GPS
information "using the procedures described in the Federal Rules of
Criminal Procedure," that is, Federal Rule of Criminal Procedure 41,
as is contemplated by this application and order.

Some, but not all, cellular telephone service providers have
the technical means to obtain GPS information.  GPS information is
not generated specifically for law enforcement, but is the product
of United States Federal Communications Commission requirements that
cellular telephone service providers maintain and access location
information for emergency responders.  To obtain GPS information, a
"ping" (electronic signal) is sent to the cellular telephone, which

unobtrusively activates the GPS chip in the telephone.  This information is not provided in a streaming fashion regardless of the cellular telephone activity, but instead is sent only in response to specific law-enforcement agency requests.  Location data through GPS information can be delivered as accurately as within three meters; however, if the cellular telephone is in motion, such as while in a moving vehicle, the error range in meters may be greater, or the cellular telephone service provider may simply provide cell-site information.  In addition, the cellular telephone must be powered on and, usually, not in the middle of a telephone call, for GPS information to be obtained.  Moreover, if the cellular telephone is inside a building, or is in some other way blocked from the satellite, GPS information may not be obtainable.  In such cases, the service provider will often provide law enforcement with cell-site information instead.

This application also seeks authorization under 18 U.S.C. § 3103a(b), for reasonable cause shown, to delay any notification the government is required to give regarding the requested warrant to the subscriber(s) and user(s) of the **Subject Telephones** for a period of 30 days from the date that the disclosure ends.  18 U.S.C. § 3103a(b) states that any notice required following the issuance of a warrant may be delayed if, inter alia, the court finds reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result.  An adverse result is defined in 18 U.S.C. § 2705(a)(2) to include endangering the life or physical safety of a person, flight from prosecution, destruction of or tampering with evidence, intimidation of potential witnesses, or otherwise seriously jeopardizing an investigation or

unduly delaying a trial.  Moreover, the Advisory Committee Notes for Fed. R. Crim. P. 41(f)(3) (2006 Amendments) state that delay of notice may be appropriate where "the officer establishes that the investigation is ongoing and that disclosure of the warrant will compromise that investigation."  The attached agent affidavit provides reasonable cause to believe that immediate notification of the execution of the warrant may have an adverse result.  The proposed warrant both provides for the giving of such notice within 30 days after the date that the disclosure ends and prohibits, as part of the receipt of the requested information, the seizure of any tangible property or any other prohibited wire or electronic information as stated in 18 U.S.C. § 3103a(b)(2).  As discussed in the attached agent affidavit, immediate notification of this warrant to the user(s) of the **Subject Telephones** may have an adverse result.

Similarly, pursuant to 18 U.S.C. § 2705(b) and 18 U.S.C. § 3123(d)(2), this application requests that the Court enter an order commanding the Carrier not to notify any person, including the subscriber(s) of the **Subject Telephones**, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the Carrier complies with the warrant or such later date as may be set by the Court upon application for an extension by the United States, for the reasons outlined in the attached agent affidavit.

This application also seeks an order that: (1) authorizes the disclosure of the requested information whether the **Subject Telephones** are located within this District, outside of the District, or both, pursuant to 18 U.S.C. § 2703(c)(1)(A) and Rule

10

41(b), and, for good cause shown, at any time of the day or night pursuant to Rule of Criminal Procedure 41; (2) authorizes the disclosure of not only information with respect to the **Subject Telephones**, but also with respect to any changed telephone number(s) assigned to an instrument bearing the same ESN, IMSI, or IMEI (hereinafter "unique identifying number") as the **Subject Telephones**, or any changed unique identifying number subsequently assigned to the same telephone number as the **Subject Telephones**, or any additional changed telephone number(s) and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same wireless telephone account number as the **Subject Telephones** within the period of disclosure authorized by the warrant; and (3) orders the Investigating Agency to reimburse the applicable cellular telephone service provider for its reasonable expenses directly incurred in providing the requested information and any related technical assistance.

Finally, this application requests that it, the proposed warrant that has been concurrently lodged, and the return to the warrant be sealed by the Court until such time as the Court directs otherwise.  Allowing disclosure to the public at large would likely

//
//
//
//
//
//

jeopardize the ongoing investigation and apprehension of the Target

Subject for the reasons outlined in the attached agent affidavit.

Dated: December 21, 2020          Respectfully submitted,

                                  NICOLA T. HANNA
                                  United States Attorney

                                  BRANDON D. FOX
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                  /s/ James A. Santiago
                                  JAMES A. SANTIAGO
                                  Assistant United States Attorney

                                  Attorneys for Applicant
                                  UNITED STATES OF AMERICA

<u>CERTIFICATION</u>

In support of this application, and pursuant to 18 U.S.C. § 3122, I state that I, James A. Santiago, am an "attorney for the Government" as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure.  I certify that the information likely to be obtained from the requested warrant is relevant to an ongoing criminal investigation being conducted by the Investigating Agency of the Target Subject for violations of the Target Offenses.

I declare under penalty of perjury under the laws of the United States of America that the foregoing paragraph is true and correct.

| December 21, 2020 | /s/ *James A. Santiago* |
|---|---|
| DATE | JAMES A. SANTIAGO |
| | Assistant United States Attorney |
| | General Crimes Section |

<u>AFFIDAVIT</u>

I, Alfredo Rossi, being duly sworn, declare and state as follows:

I.   <u>INTRODUCTION</u>

1.   I am a Special Agent with Homeland Security Investigations ("HSI") and have been so employed since June 2019.  I am currently assigned to the El Camino Real Financial Crimes Task Force ("ECR2"), where I investigate matters concerning bank fraud, wire fraud, identity theft, money laundering, and other illegal financial transactions.

2.   Prior to becoming a Special Agent with HSI, I was employed as Special Agent with the United States Secret Service ("USSS") from June 2016 until June 2019, where I was responsible for the investigation of various types of theft and fraud, including the manufacturing of counterfeit and fraudulent identification documents, and the investigation of financial crimes (such as access device crimes, credit card fraud, check fraud, and schemes to conceal and launder the proceeds of such crimes).

3.   To become an HSI Special Agent, I completed nine months of training at the Federal Law Enforcement Training Center in Brunswick, Georgia.  During my employment as an HSI and USSS Special Agent, I have participated in several investigations related to alien smuggling, narcotics smuggling, weapons trafficking, organized criminal activity, child exploitation, and financial crimes.  I have participated in various aspects of criminal investigations, including bank records analysis, telephone records analysis, electronic surveillance, physical surveillance, search warrants, arrests, and reviewing evidence from digital devices.  I have also

spoken to many law enforcement agents regarding their experience in criminal investigations, interviewed defendants, confidential informants, and witnesses who had personal knowledge regarding the methods used to commit various types of criminal offenses.

## II. <u>PURPOSE OF AFFIDAVIT</u>

4. This affidavit is made in support of an application for a warrant authorizing the disclosure of prospective cell-site information, as well as GPS information, as defined within the application, at such intervals and times as the government may request, and the furnishing of all information, facilities, and technical assistance necessary to accomplish said disclosure unobtrusively, which disclosure will establish the approximate location of the following cellular telephones for a period of 45 days, as well as historical cell-site information, to include call detail, text, and data information that was gathered from October 13, 2020 through December 11, 2020 for the following:

a. 626-404-5413, a cellular telephone issued by T-Mobile ("Carrier"), believed to be used by Hue Kim Lam, also known as "Jennifer Lam" ("**Subject Telephone 1**"); and

b. 626-423-8232, also issued by T-Mobile, subscribed to D.H., and believed to be used by Hue Kim Lam ("**Subject Telephone 2**"; and, together with **Subject Telephone 1**, collectively referred to as the "**Subject Telephones**").

5. I also seek authorization under 18 U.S.C. § 3103a(b), for reasonable cause shown below, to delay notification of the proposed warrant for a period of 30 days from the date that the disclosure ends.

6.    As described more fully below, I respectfully submit there is probable cause to believe that cell-site information, as well as GPS information, likely to be received concerning the approximate location of the **Subject Telephones**, will constitute or yield evidence of the location of Hue Kim Lam, also known as "Jennifer Lam" ("LAM" or the "Target Subject"), who is currently a fugitive from a federal arrest warrant, and aid in the apprehension of LAM for the charge of violations of 18 U.S.C. § 1029(a)(2): Using an unauthorized access device and obtaining things of value aggregating at least $1,000 during a one-year period; 18 U.S.C. § 1028A(a)(1): Using a means of identification belonging to another person; 18 U.S.C. § 1029(a)(3): Possessing at least fifteen unauthorized access devices; and 18 U.S.C. § 1029(a)(4): Possessing device-making equipment (the "Target Offenses").

7.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of, or investigation into, this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

III. STATEMENT OF PROBABLE CAUSE

8.    On July 10, 2020, in the Central District of California, LAM was charged by an Indictment in case number 20-CR-00283-FMO, with violating 18 U.S.C. § 1029(a)(2): Using an unauthorized access device and obtaining things of value aggregating at least $1,000

4

during a one-year period; 18 U.S.C. § 1028A(a)(1): Using a means of identification belonging to another person; 18 U.S.C. § 1029(a)(3): Possessing at least fifteen unauthorized access devices; and 18 U.S.C. § 1029(a)(4): Possessing device-making equipment.  A warrant was also issued on July 10, 2020, commanding that LAM be arrested to answer for the charge in the Indictment.  LAM has not been arrested and is not in custody.

<u>Violations of the Target Offenses by LAM and Others</u>

9.   Based on my review of investigative materials, reports, and my knowledge of the investigation, including my review of report of by members of the Inglewood Police Department ("IPD"), I know the following:

a.   On August 21, 2019, around 1:15 p.m., IPD Officers Wunderlich and Trujillo were driving in an unmarked IPD police car when they saw a black 2017 Volkswagen Jetta, California License 8KPA116.

b.   Officers saw the vehicle driving southbound in the number one lane (the farthest left lane) of traffic at the intersection between Inglewood Avenue and Manchester Boulevard.  The vehicle signaled a right turn and executed it from the number one lane once the traffic light turned green, a violation of California Vehicle Code § 22100(a).

c.   LAM was driving the Jetta and a male, later identified as Doan Giang Truong, was sitting in the front passenger seat of the vehicle.  Due to the IPD officers' proximity to the vehicle LAM was driving, they had a clear, unobstructed view into the front passenger area where Truong was sitting and could see he was not wearing a seatbelt in violation of California Vehicle Code

§§ 27315(d),(e).  IPD officers then initiated a traffic stop of the vehicle by activating the forward-facing red emergency light and siren.

        d.    After the Jetta pulled over, Officer Wunderlich asked LAM for her driver's license and LAM said that she did not have a California driver's license.  IPD Officers conducted a wants and warrants check on LAM.  The wants and warrants search revealed that LAM was currently on Los Angeles County probation for a narcotics offense through September 10, 2019.  LAM told IPD Officers she was subject to search and seizure as a condition of her probation.  IPD officers then asked LAM to step out of the car so that the officers could conduct a probation search of her vehicle.  LAM then offered the IPD Officers $1,000 if they allowed her to leave the traffic stop, in violation of California Penal Code Section 67 (Bribery of an Executive Officer or Public Employee).

        e.    IPD Officers detained LAM and Truong and began searching LAM's car.  Before initiating the search, IPD Officers saw a black purse on top of LAM's lap.  IPD Officers began searching LAM's purse and found the following:

            i.    Six miscellaneous credit/debit cards, with a name embossed on the front of the cards other than LAM's.  IPD Officers observed that the card numbers had been re-embossed with new numbers.

            ii.  One First Premier Bank Master Card embossed with LAM's name.

            iii. A silver iPhone inside a pink case, and a black Samsung Galaxy, in a black case.

f.   IPD Officers also discovered a black neoprene laptop bag in the rear passenger area of the vehicle.  Officers searched the bag and found an HP laptop, miscellaneous documents, and a black BLU cellphone inside.

g.   Also, inside the laptop bag, officers recovered a separate black and white bag.  Officers searched the black and white bag and observed the following:

i.   Three state-issued benefits cards embossed with LAM's name on the front.

ii.   35 miscellaneous credit/debit cards embossed on the front with no names or names other than LAM's.

iii.  15 miscellaneous cards issued by grocery stores, casinos or hotel rooms.

iv.   Three computer access cards with handwritten codes on the back of them.

v.   Four California driver's licenses issued to people other than LAM.

vi.   One Nevada Identification Card issued to an individual other than LAM.

h.   LAM was found in possession of an expired genuine California driver's license issued to her true name.  The expired driver's license was located on top of a California driver's license with LAM's photo and the name of K.C.

i.   Officers also found a rainbow-colored bag inside the laptop bag.  Inside the rainbow-colored bag, officers saw a black and silver Deftun MSR-X6 Bluetooth card scanner.

i.   Based on my training and experience in the field of identity theft investigations, I know this device is used to

7

detect and decode the "tracks" contained in the magnetic strip of a credit card.  On a genuine credit card the "track" typically includes personal information such as the account holder's name, credit card number and expiration date.  Certain scanners can also be used to re-encode the data originally embedded in the magnetic strip with new data, inputted by the user of the scanner.

       j.    Officers also recovered 49 blank credit/debit cards from the car.  Forty cards had a black magnetic strip and gold colored "chip" affixed to the card.  Nine cards were completely blank and lacked the affixed "chip."

       k.    In the trunk of the car, officers found a black ASOS laptop computer.

Interview with and Admissions by LAM

    10.    Based on my review of reports of the interview, I know that on or about August 21, 2019, Task Force Officer ("TFO") Jeremy Crossen and U.S Postal Inspector Jordan Lovelace, with the U.S Postal Service's Identity Theft and Economic Crimes Task Force, conducted an interview with LAM in the IPD Jail.  LAM was read her Miranda Advisement Rights from a standard IPD Miranda Advisement form, which she stated she understood and subsequently signed.  The interview was recorded via both audio and video.  From my review of interview materials and the reports, I know that LAM said the following pertinent things in the interview:

       a.    She is involved in the manufacturing and sales of counterfeit credit cards.

       b.    Her main fraud enterprise involved access device fraud committed in gaming casinos in both California and Nevada.

   c. A friend of hers told her that the Hollywood Park Casino, in Inglewood, California, used a technologically outdated ATM which only required that an access card have a working magnetic strip and not an RFID chip. She exploited this weakness by bringing stolen access device cards of poor quality to the Casino.

   d. Either LAM or someone else would test the cards at a point of sale ("POS") terminal, by conducting a verification transaction. If that transaction was successful, LAM would obtain a higher quality credit card, printed off a blank credit card "tipped" with her personal identifying information ("PII") on the face of the card, and containing another person's stolen account information in the magnetic strip.

   e. LAM successfully used fraudulent access device cards containing stolen PII at the Hollywood Park Casino at least three times in the last several days.

   f. She obtained approximately $1,000.00 USD from each cash advance transaction and that the money recovered from her bra at the IPD jail were proceeds derived from the three fraudulent transactions.

   g. LAM approached Truong and other co-conspirators and recruited them to participate in access device fraud at the Hollywood Park Casino.

   h. LAM had known Truong for approximately several months and had met him in the City of Monterey Park, through a mutual friend.

   i. LAM possessed a counterfeit California driver's license in K.C.'s name but was upset over the poor quality of the license.

<u>October 2020, Arrest of LAM</u>

11.   Based on my review of reports of the incident, I know that California Highway Patrol officers arrested LAM on October 13, 2020. The pertinent facts of the incident include the following:

a.   On or about October 13, 2020, at approximately 23:51 hours, Officers I. Ayala and T. Hudlow, of the CHP East Los Angeles Area Office, were driving eastbound on the 10 Freeway at the San Gabriel Boulevard Exit.  The Officers observed a grey Mercedes Sedan, traveling at approximately 91 MPH, a violation of California Vehicle Code 22349(a) - speeding in excess of 65 MPH and straddling the painted broken white line, bordering the south edge of the number two lane, a violation of California Vehicle Code 21658(a) – unsafe lane change.

b.   The CHP Officers activated their forward facing red emergency lights to initiate a traffic stop on the Mercedes.  The Mercedes immediately accelerated away from the Officers, into the number one traffic lane.  The Mercedes continued to weave in and out of traffic at approximately 130 MPH.

c.   The Officers were able to position their patrol vehicle to the rear of the Mercedes, which transitioned to the right shoulder of the highway, utilizing the right shoulder to pass vehicles at approximately 110 MPH, a violation of California Vehicle Code 21755(a) – unsafe passing.  The Mercedes transitioned back onto the highway, traveling eastbound at approximately 130 MPH.

d.   The Mercedes attempted to exit the freeway, via the Puente Avenue off-ramp and immediately transitioned to the "Bus Ramp" to enter back onto the I-10 Eastbound freeway.

e.   The Mercedes later attempted to exit the freeway, using the Pacific Avenue/West Covina Parkway off-ramp.  The driver lost control and proceeded through the gore point, a painted triangular-shaped zone, designed to safely manage merging traffic. The Mercedes struck several trees and collided with a chain-link fence.

f.   The Officers positioned their patrol vehicle in front of the Mercedes and exited their vehicle.  The Officers observed a female, later identified as LAM, running away from the Mercedes. The Officers eventually caught up with LAM and arrested her at approximately 23:57 hours, north of the Garvey Avenue and West Covina Parkway Intersection.

g.   CHP Officers Garcia and Sevilla transported LAM back to the scene of the collision.  Officer Ayala asked LAM her name and she did not answer.

h.   Officer Ayala located a California Driver's License, bearing the name G.G., in the front passenger's seat footwell, which resembled the female Asian driver of the Mercedes.  Officer Ayala asked LAM if the license belonged to her, to which LAM nodded up and down, indicating "yes".  Officer Ayala asked LAM if her name was G.G., to which LAM replied, "Yeah".

i.   Officers conducted a DUI Investigation on LAM and transported her to the Los Angeles County Sheriff Department ("LASD") Century Regional Detention Facility ("CRDF"), for subsequent booking.

j.   LASD Deputies fingerprinted LAM and a live scan return revealed LAM's true identity.

k.   CHP Officer Martinez conducted a follow up with victim G.G., who stated she had recently lost her wallet and driver's license.  G.G told Officer Martinez that she did not know LAM, nor did LAM have her permission to use or be in possession of her California Driver's License.  Officer Martinez was also able to confirm that G.G. did not purchase the Mercedes, which was financed in G.G.'s name and driven by LAM.  Officer Martinez was able to determine, via his follow up investigation, that LAM embezzled the Mercedes, purchasing it in G.G.'s name.

l.   LAM was charged with multiple violations of the California Vehicle and Penal Codes in <u>People v. Lam</u>, Case No. GA108701-01 (Los Angeles Super. Ct, filed Oct. 16, 2020).

m.   LAM was released on bond, despite having an active Federal Arrest Warrant in the system, posted in the amount of $125,000 by Bail Hotline Bail Bonds.

<u>Identification of Subject Telephones Connected to LAM</u>

12.   On December 2, 2020, I contacted LAM's Bail Agent, informing him of LAM's Federal Arrest Warrant and requested that the Bail Agent contact LAM via telephone to ask that she appear at the bail office to re-sign several documents that were signed in G.G.'s name.  Based on my communications with the Bail Agent, I know that LAM was contacted at **Subject Telephone 1**, a number LAM provided to Bail Hotline Bail Bonds and subsequently received calls on.

13.   Based on my participation in the operation, discussions with those involved and review of reports, I know that on December 3, 2020, HSI Special agents with El Camino Real ("ECR"), Group 2, initiated surveillance of Bail Hotline Bail Bonds located at 11354

Valley Blvd., El Monte, CA 91731 in an attempt to locate LAM.  The following pertinent events occurred:

a.    At approximately 1230 hours, LAM's Bail Agent received a call from LAM, on **Subject Telephone 2**.  LAM said her other phone was not working and that she was a few minutes away from the location.

b.    At approximately 13:15 hours, SA Juan Orrantia observed a blue colored, four door sedan, park curbside on Valley Boulevard, facing southbound.

c.    SA Orrantia observed an Asian female matching the description of LAM exit the driver's seat of the blue sedan.  SA Orrantia observed LAM walk to the Bail Hotline Bail Bonds office, a short distance from her vehicle, and enter the front of the business.

d.    Approximately 20-30 seconds later, SA Orrantia observed LAM exit the front door of the bail office.  SA Orrantia observed LAM begin to walk back to the blue sedan.  While walking to the blue sedan, several Bail Hotline Bail Enforcement Agents approached LAM.  SA Orrantia heard one of the Bail Enforcement Agents yell out for LAM.  SA Orrantia observed LAM run towards the blue sedan and enter via the driver's side door.

e.    LAM started the vehicle and reversed away from the Bail Enforcement Agents.  SA Orrantia observed LAM conduct a rapid "U-turn" maneuver on Valley Boulevard and proceed northbound on Valley Boulevard at a high rate of speed.

f.    Group Supervisor ("GS") Matthew Stocks and SA Orrantia activated their emergency lights and sirens to initiate a

13

traffic stop on LAM and proceeded to follow the blue sedan driven by LAM.

g.   GS Stocks observed that LAM's vehicle displayed out of state license plates, however he could not determine which state.

h.   LAM failed to stop or yield to both GS Stocks and SA Orrantia.   LAM ignored both stop signs and red traffic signal lights, passing through a "stale red" light, and continuing northbound on Valley Boulevard in excess of the 35 MPH posted speed limit.

i.   SA Orrantia observed LAM make a right turn at a high-rate of speed onto Tyler Avenue and continue eastbound on Tyler Avenue in excess of the 30 MPH posted speed limit.

j.   SA Orrantia could see the blue sedan which was approximately 1/4 to 1/2 mile in front of pursuing agents and bouncing along the intersections, indicating the vehicle was traveling at a high rate of speed, unsafe for prevailing road conditions.   SA Orrantia observed that LAM failed to stop or yield at stop signs, crosswalks, and traffic signals.

k.   At the intersection of Tyler Avenue and Santa Anita Avenue, GS Stocks and SA Orrantia lost sight of LAM, however they continued to search the area for the blue sedan.

l.   Agents were ultimately unable to locate LAM, or the blue sedan, and at approximately 13:40 hours, ended the search.

m.   TFO Crossen called **Subject Telephone 1** several times. Each time the phone did not ring, and the call was sent directly to voicemail.

14.   Based on my communications with him, I know that on or about December 3, 2020, TFO Crossen called **Subject Telephone 2**

14

multiple times.  Each time TFO Crossen attempted to contact the number, it would ring from once, up to several times, before a voicemail message played.  TFO Crossen attempted to send a text message to each of the **Subject Telephones**, informing LAM that she is wanted by law enforcement and she should self-surrender.  TFO Crossen also left voicemail messages with both **Subject Telephones**, instructing LAM to contact him.  As of December 11, 2020, LAM has not made any effort to contact law enforcement and has ignored all calls from Bail Hotline.

15.  Because the Investigating Agency obtained the numbers for the **Subject Telephones** from a bail agent and due to the immediate need to locate the fugitive target before she stops using the **Subject Telephone** numbers, there is insufficient time to obtain subscriber records from the telephone company, which could take up to several weeks, without jeopardizing the fugitive investigation.

16.  I seek prospective cell-site/GPS information via this application because this information will assist in locating and apprehending LAM who is clearly attempting to avoid capture.  Moreover, it will assist in targeting surveillance and reduce the risk of being prematurely detected before LAM is in custody.  Fugitives, as well as people who are involved in criminal activity, are often conscious of being followed and keep a close eye out for surveillance units.  The chance of being discovered increases with the more surveillance that is done and the closer the surveillance units must get to their target subject(s).  Use of the prospective cell-site/GPS information enables the investigative team to be more focused and judicious in its use of surveillance and enables the investigative team the ability to conduct surveillance at a greater

distance, because the fear of losing the target is reduced when surveillance is maintained via GPS/cell-site information.

## IV. <u>GROUNDS FOR SEALING AND DELAYING NOTICE</u>

17. Based on my training and experience and my investigation of this matter, I believe that reasonable cause exists to seal this application and warrant, as well as the return to the warrant. I also believe that reasonable cause exists to delay the service of the warrant by the Investigating Agency as normally required for a period of 30 days beyond the end of the disclosure period pursuant to 18 U.S.C. § 3103a(b) and, pursuant to 18 U.S.C. § 2705(b), to enter an order commanding the Carrier not to notify any person, including the subscriber(s) of the **Subject Telephones**, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the Carrier complies with the warrant or such later date as may be set by the Court upon application for an extension by the United States. There is reason to believe that such notification will result in: (1) flight from prosecution; (2) destruction of or tampering with evidence; (3) intimidation of potential witnesses; (4) otherwise seriously jeopardizing the investigation; or (5) unduly delaying trial.

18. Furthermore, there is good cause for the warrant to be issued such that the information may be provided to law enforcement at any time of the day or night because in my training and experience, and knowledge of this investigation, the subjects of the investigation do not confine their activities to daylight hours, and it is often even more difficult to conduct surveillance at night.

## V.   CONCLUSION

19.   For all of the above reasons, there is probable cause to believe that prospective cell-site information, as well as GPS information, likely to be received concerning the approximate location of the **Subject Telephones**, currently within, or being monitored or investigated within, the Central District of California, as well as historical cell-site information related to the **Subject Telephones** from October 13, 2020 through December 11, 2020 will constitute or yield evidence of the location of LAM and aid in the apprehension of LAM, who is currently a fugitive from a federal arrest warrant.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
_____, 2020.


_____
HONORABLE
UNITED STATES MAGISTRATE JUDGE

17